DAVIDSON BUILDING COMPANY, Appellant, v. E. H. MULOCK, Mayor, et al., Appellees.

No. 40577.

FEBRUARY 10, 1931.

REHEARING DENIED JUNE 20, 1931.

732

Sam Abramson and Parrish, Cohen, Guthrie, Watters & Halloran, for appellant.

George Comfort, Chauncey A. Weaver and C. R. S. Anderson, for appellees.

Earl Wisdom, Asst. Atty. General, Amicus Curiae.

WAGNER, J.—The plaintiff, Davidson Building Company, is the owner of certain real estate in the city of Des Moines, which was duly assessed for the year 1929. In accordance with the provisions of Section 7132, Code, 1927, complaint as to the assessment was made by said Company to the local Board of Review for the City of Des Moines. This local Board of Review adjourned May 31, 1929, and the plaintiff, on June 15, 1929, in exact accord with the provisions of Section 7133, Code, 1927, took an appeal from the action of the local Board of Review to the District Court of Polk County.

In April, 1929, the Legislature enacted Chapter 205, Acts of the 43 G. A., which took effect upon publication on April 26, 1929. Sections 28, 29 and 30 of said chapter amend Sections 7132 and 7133, Code, 1927. Before the amendment, Section 7132, Code, 1927, was as follows:

"Any person aggrieved by the action of the assessor in assessing his property may make oral or written complaint thereof to the board of review, which shall consist simply of a statement of the errors complained of, with such facts as may lead to their correction, and any person whose assessment has been raised or whose property has been added to the assessment rolls, as provided in the preceding section, and any member of the board of review aggrieved by any action of the board of review of which he was, at the time complained of, a member, shall make such complaint before the meeting of the board for final action with reference thereto, as provided in said section."

Said section remains complete, except that by the amendment, the word "final" is stricken therefrom. The amendatory act attached four sub-sections to Section 7132, Code, 1927, as follows:

"7132-c1. *Appeal to county board of review.* Appeals may be taken from the action of local board of review with

reference to such complaint to the county board of review by filing with the local board a notice of appeal, and a duplicate thereof with the county board, within ten days after final adjournment of the local board, which notice shall specify the actual complaint of and the reasons assigned for such complaint.

"7132-c2. The board of supervisors shall constitute a county board of review, and shall sit and act as such board at their regular meeting in May and shall adjourn as such board from time to time until all such appeals have been heard.

"7132-c3. The county board may require the local board to certify the minutes of the proceedings resulting in such action and may affirm, reverse or modify the findings and decision of the local board.

"7132-c4. The clerk of the county board shall transmit to the local board a statement of the findings and decision of the county board, and a statement of the changes made by the county board in the assessment complained of."

Before the amendment, Section 7133, Code, 1927, was as follows:

"Appeals may be taken from the action of the board with reference to such complaints to the district court of the county in which such board holds its sessions, within twenty days after its adjournment. Appeals shall be taken by a written notice to that effect to the chairman or presiding officer of the reviewing board, and served as an original notice."

By the amendatory act, the word "board" was stricken therefrom and the words "county board of review" inserted in lieu thereof. Section 7137, Code, 1927, remains unchanged and is as follows:

"The board of supervisors shall constitute a county board of review, and shall adjust the assessments of the several townships, cities, and towns of their county at their regular meeting in June, and add to or deduct from the assessed value of the property substantially as the state board adjusts assessments of the several counties of the state."

Under this latter section, the board of supervisors, constituting a county board of review, only adjusts or equalizes the assessments of the several townships, cities and towns of

734

their respective counties. Under the aforesaid amendatory act, an attempt was made to constitute the board of supervisors a county board of review, with power to pass upon the merits of individual assessments. It will be noted, that the plaintiff company followed strictly the provisions of the statutory law as it was prior to the amendatory act, and disregarded entirely the provisions of the amendment. While Section 7132-c2 of the amendatory act hereinbefore quoted, states that the board of supervisors shall constitute a county board of review and shall sit and act as such board at their regular meeting in May, etc., there is no regular meeting provided by the statutory law for the board of supervisors during the month of May. Section 5118, Code, 1927, provides:

"The members of the board of supervisors shall meet at the county seat of their respective counties on the second secular day in January and on the first Monday in April and the second Monday in June, September, and November in each year, and shall hold such special meetings as are provided by law," etc.

Section 7129, Code, 1927, provides that the township trustees shall constitute the local board of review for the township, or the portion thereof not included within any city or town, and that the city or town council shall constitute such board for such city or town. It is further provided therein, that the local board of review shall meet on the first Monday of April and sit from day to day until its duties are completed, which shall be not later than the first day of May, but that in cities having a population of 10,000 or over, such board shall meet on the first Monday of May and shall complete its duties not later than the first day of June. It is shown by the record, that the board of supervisors met on May 1st, 11th, 15th and 28th, which meetings were adjourned sessions of the regular April meeting of said board. It is also shown by the record, that on June 27, 1929, the board of supervisors met as a board of review to review and adjust the assessments among the various townships. The witness, Ben Dewey, testifies that he is the secretary of the board of supervisors of Polk County, and has been for the last several years; that he keeps his office in the board of supervisors' room and his usual hours are from 8:00 A.M. to 5 P.M. every day in the week, except Sundays and holidays and that with the

exception of Sundays he was in his office after the last day of May 1929 (the date of adjournment of the local board of review) up to and including the 12th day of June, 1929.

The motion of the defendants to dismiss the appeal is for the reason that, the court is without jurisdiction to determine the same, the substance of the averments of said motion being that the plaintiff should have appealed from the action of the local board of review to the county board of review, in accordance with the provisions of the Sections of the amendatory act hereinbefore quoted. The plaintiff filed a resistance to the defendants' motion to dismiss, alleging that these sections are unconstitutional, vague, uncertain and therefore, void for uncertainty; and also that the provisions of the amendatory act have no application to taxes assessed for the year 1929. The plaintiff appeals from the action of the trial court in sustaining defendants' motion to dismiss the appeal.

It is the contention of the appellant that Chapter 205 of the Acts of the Forty-Third General Assembly, and Sections 28, 29 and 30 of said chapter are unconstitutional, as not complying with Section 29, Article 3, of the State Constitution, which provides:

"Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

The title to the act is quite lengthy and in so far as material to the appellant's contention in argument is as follows:

"An act relating to the assessment of property for taxation, to create a state board of assessment and review, to define the powers, rights, and duties of said board and of the officers thereof, and of other public officers with reference to said subject matter, to amend chapters three hundred thirty-six (336) to three hundred forty-one (341), both inclusive, and also chapter three hundred forty-one-a one (341-a1), Code of 1927, inserting the term 'state board of assessment and review' or 'state board' in lieu of the terms 'executive council' or 'council', * * * to amend section seventy-one hundred. thirty-two (7132) of the code, 1927, relating to board of review by providing for appeal

from local boards of review and to amend chapter three hundred forty-three (343) of the code, 1927, by adding thereto sections 7132-c1, 7132-c2, 7132-c3, and 7132-c4, and by amending section seven thousand one hundred thirty-three (7133), of the code of 1927, relating to county boards of review and prescribing methods of appeal thereto and of appeal from said county boards of review to the district court," etc.

The appellant contends that the subject matter of the legislation is not expressed in the title to the act and that said Chapter 205 embraces more than one subject, in violation of the aforesaid section of the constitution. The general subject of said enactment is the assessment of property for taxation, and the creation of instrumentalities to bring about a fair and equitable assessment of property. There is contained in the title to the act, the aforesaid general subject, and also suggested amendments to certain sections of the code, which amendments are germane to, or "properly connected" with the general subject of the legislation. It will be observed that the aforesaid provision of the constitution provides:

"Every act shall embrace but one subject, *and matters properly connected therewith.*" (The italicized words were added to the constitution of 1846.)

In Cook v. Marshall County, 119 Iowa 384, we declared that these added words are highly important and are clearly indicative of an intention that the section should have a liberal construction. We have frequently had before us, for our consideration, questions involving titles to legislative enactments, and the rules for determining the sufficiency thereof have been thoroughly considered and elaborated. It is a well established principle which this court has often applied, that it is the duty of the courts to give such construction to an act, if possible, as will avoid the necessity of holding it void for unconstitutionality. See Cook v. Marshall County, 119 Iowa 384; Chicago, R. I. & P. Ry. Co. v. Rosenbaum, 212 Iowa 227. In the Rosenbaum case, we said:

" 'The objection should be grave, and the conflict between the statute and the constitution palpable, before the judiciary should disregard a legislative enactment upon the ground that

it embraces more than one subject or object, or if it embraces but one subject or object, that it is not sufficiently.expressed by the title.' ''

In Chicago, R. I. & P. R. Co. v. Streepy, 207 Iowa 851, at 855, we quoted approvingly from Judge Cooley, the reasons given by him for the aforesaid constitutional provisions which are as follows:

'' 'It may therefore be assumed as settled that the purpose of these provisions was: First, to prevent hodge-podge or ''log-rolling'' legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire.' 1 Cooley's Constitutional Limitations (8th Ed.) 295, 296.''

In Cook v. Marshall County, 119 Iowa 384, we said:

''The end sought to be obtained by the constitutional provision invoked by the appellants 'was to prevent the union in the same act of incongruous matters and of objects having no connection, no relation.' And with this it was designed to prevent surprise in legislation by having matters of one nature embraced in a bill whose title expressed another. State v. Davis Co. Judge, 2 Iowa 281. This, it has often been held, does not require a construction forbidding the inclusion in one act of all matters germane to the main proposition or purpose sought to be effected, even though they are not specifically mentioned in the title. If there is a 'unity of object' in the various provisions, and that general object is indicated by the title, then, no matter how multifarious the provisions of the act, it sufficiently complies with the constitution. * * * 'The constitution is obeyed if all the provisions relate to the one subject indicated in the title, and parts of it, or incident to it, or reasonably connected with it, or in some sense auxiliary to the object in view.' ''

738

In Fevold v. Board of Supervisors of Webster County, 202 Iowa 1019, we said:

"It is the uniform rule that this constitutional requirement is not to be given a narrow or limited construction. It is not intended to prohibit the writing in one bill of any number of provisions having one general object, fairly indicated by the title; and it is not necessary that the title shall be an index of the details of the act, nor that every provision of the several sections of the statute be enumerated in the title."

In Chicago, R. I. & P. Ry. Co. v. Rosenbaum, 212 Iowa 227, we said:

"The purpose of the constitutional provision is to prevent the evils of omnibus bills and surreptitious legislation."

For additional authorities as to these propositions, see Clear Lake Co-operative Live Stock Shippers' Association v. Weir, 200 Iowa 1293; State v. Gibson, 189 Iowa 1212; In re Estate of Pedersen, 198 Iowa 166; Rains v. First National Bank of Fairfield, 201 Iowa 140; State ex rel. Weir v. The County Judge of Davis County, 2 Iowa (Cole), 280; Beresheim v. Arnd, 117 Iowa 83.

The title to the act provides for an amendment "relating to board of review by providing for appeal from local boards of review", and an amendment to Section 7133 of the code "relating to county boards of review and prescribing methods of appeal thereto and of appeal from said county boards of review to the district court." The title states that it is an act relating to the assessment of property for taxation, to create a state board of assessment and review, and define its powers, rights and duties; and to provide for an appeal from the local board of review to the county board of review and from the county board of review to the district court. The title was sufficient to apprise the legislators, and anyone interested, of the contemplated amendments to the chapters and sections of the code therein mentioned. There is a unity of object in the various provisions of the act, and that general object is sufficiently expressed in the title to the act. The act itself in Paragraph 1 of Section 17, provides that the purpose is "that all assessments of property and taxes levied thereon be made rela-

tively just and uniform in substantial compliance with law.''
In view of the rules announced in the foregoing authorities, it
cannot be said that the legislation in question, or the amend-
ments to Sections 7132 and 7133, Code, 1927, are unconstitu-
tional, for non-compliance with the aforesaid section of the con-
stitution.

 Appellant further complains that Sections 28, 29 and
30 of the amendatory act, being the amendments to Sections
7132 and 7133, Code, 1927, do not operate uniformly and are
therefore, violative of the provisions of Section 30, Article 3,
of the State Constitution. There is no merit in this contention,
as said amendments, upon the taking effect of said act on April
26, 1929, if valid, applied with equal force to all tax payers
who might complain of over assessments and who, after the act
became effective, had the right to appeal.

 Appellant has assailed the validity of Chapter 205, Acts
43 G. A., and Sections 28, 29 and 30 thereof, on the ground,
as claimed, that said Act was not passed with due regard for
the provisions of our state constitution. The exact contention
seems to be that the journals do not show that the two houses
of the Legislature concurred in the same bill. Stated as briefly
as possible, it is shown by certified copies of the journals of the
respective houses of the legislature, that the bill originated in
the Senate, as Senate File No. 76, and duly passed the Senate.
It was messaged to the House of Representatives and there
amended, by striking out all after the enacting clause, and
passing a substitute. The bill thus passed by the House, was
messaged to the Senate. The Senate concurred in part, refused
to concur in part, and further amended the bill as passed by
the House. The House refused to concur in the Senate Amend-
ments. The Senate refused to recede. A conference committee
was appointed, which committee reported that they recommend
that the House concur in all Senate Amendments, with two ex-
ceptions, and proposed amendments to the two excepted. The
report of the conference committee was adopted by the Senate,
and said body concurred in the amendments, and on April 12th
the Senate action on Conference Committee's report was re-
ceived in the House. No complaint is made as to what is shown
by the Journal of the Senate relative to this matter. The Journal
of the House for April 12th shows that a member moved that

the report of the Conference Committee be adopted, that a motion for the previous question prevailed, and "On question, shall the report of the Conference Committee on Senate File No. 76 be adopted? a roll call was taken, ayes 72, nays 27." Appellant's contention is, that the journal of the House fails to show a compliance with Section 17, Article III, State Constitution, for the passage of bills, and only shows the adoption of the report of a committee. The bill was reported as correctly enrolled, signed by the Speaker of the House and the President of the Senate, and was approved by the Governor.

We need not pause to consider whether the language appearing upon the journal of the House is strictly sufficient in itself to show a passage of the bill and the concurrence of said body in the amendments; for the rule obtains in the Supreme Court of the United States and in the majority of the State Supreme Courts, including Iowa, that, a bill which has been enrolled, properly authenticated by the presiding officers of both Houses of the Legislative body, and approved by the Executive, is *conclusively presumed* to have been regularly and legally enacted, and that the courts have no power to go behind it and look at the legislative journals, or other records, for the purpose of determining whether constitutional requirements as to form and procedure were observed. See 36 Cyc. 971 and 972, and numerous cases cited under Note 7. That Iowa is committed to this rule, see State v. Lynch, 169 Iowa 148; Duncombe v. Prindle, 12 Iowa 1.

In Marshall Field & Co. v. Clark, (U. S.) 36 L. Ed. 294, the Supreme Court of the United States declared:

"The argument in behalf of the appellants is, that a bill, signed by the Speaker of the House of Representatives and by the President of the Senate, presented to and approved by the President of the United States, and delivered by the latter to the Secretary of State, as an Act passed by Congress, does not become a law of the United States if it had not in fact been passed by Congress. In view of the express requirements of the Constitution the correctness of this general principle cannot be doubted. There is no authority in the presiding officers of the House of Representatives and the Senate to attest by their signatures, nor in the President to approve, nor in the Secretary

of State to receive and cause to be published, as a legislative Act, any bill not passed by Congress.

"But this concession of the correctness of the general principle for which the appellants contend does not determine the precise question before the court; for it remains to inquire as to the nature of the evidence upon which a court may act when the issue is made as to whether a bill originating in the House of Representatives or the Senate, and asserted to have become a law, was or was not passed by Congress. This question is now presented for the first time in this court. It has received, as its importance required that it should receive, the most deliberate consideration. We recognize, on one hand, the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the Constitution relating to the enactment of laws that are to operate wherever the authority and jurisdiction of the United States extend. On the other hand, we cannot be unmindful of the consequences that must result if this court should feel obliged, in fidelity to the Constitution, to declare that an enrolled bill, on which depend public and private interests of vast magnitude, and which has been authenticated by the signatures of the presiding officers of the two houses of Congress, and by the approval of the President, and been deposited in the public archives, *as an Act of Congress,* was not in fact passed by the House of Representatives and the Senate, and therefore did not become a law.

"The clause of the Constitution upon which the appellants rest their contention that the Act in question was never passed by Congress is the one declaring that 'each House shall keep a journal of its proceedings, and from time to time publish the same, except such parts as may in their judgment require secrecy; and the yeas and nays of the members of either house on any question shall, at the desire of one fifth of those present, be entered on the journal.' Art. 1, Sec. 5. It was assumed in argument that the object of this clause was to make the journal the best, if not conclusive evidence upon the issue as to whether a bill was, in fact, passed by the two houses of Congress. But the words used do not require such interpretation. On the contrary, as Mr. Justice Story has well said, 'the object of the whole clause is to insure publicity to the proceedings of the Legislature, and a correspondent responsibility of the members to

their respective constituents. And it is founded in sound policy and deep political foresight. Intrigue and cabal are thus deprived of some of their main resources, by plotting and devising measures in secrecy. The public mind is enlightened by an attentive examination of the public measures; patriotism, and integrity, and wisdom obtain their due reward; and votes are ascertained, not by vague conjecture, but by positive facts. * * * So long as known and open responsibility is valuable as a check or an incentive among the representatives of a free people, so long a journal of their proceeding and their votes, published in the face of the world, will continue to enjoy public favor and be demanded by public opinion.' 2 Story, Const. Sections 840, 841.

"In regard to certain matters, the Constitution expressly requires that they shall be entered on the journal. To what extent the validity of legislative action may be affected by the failure to have those matters entered on the journal, we need not inquire. No such question is presented for determination. But it is clear that, in respect to the particular mode in which, or with what fullness, shall be kept the proceedings of either house relating to matters not expressly required to be entered on the journals; whether bills, orders, resolutions, reports, and amendments shall be entered at large on the journal, or only referred to and designated by their titles or by numbers; these and like matters were left to the discretion of the respective houses of Congress. Nor does any clause of that instrument, either expressly or by necessary implication, prescribe the mode in which the fact of the original passage of a bill by the House of Representatives and the Senate shall be authenticated, or preclude Congress from adopting any mode to that end which its wisdom suggests. Although the Constitution does not expressly require bills that have passed Congress to be attested by the signatures of the presiding officers of the two houses, usage, the orderly conduct of legislative proceedings, and the rules under which the two bodies have acted since the organization of the government, require that mode of authentication.

"The signing by the Speaker of the House of Representatives, and, by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration

by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled Act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to co-equal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated; leaving the courts to determine when the question properly arises, whether the Act, so authenticated, is in conformity with the Constitution.

"It is admitted that an enrolled Act, thus authenticated, is sufficient evidence of itself—nothing to the contrary appearing upon its face—that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States if the journal of either House fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committees on enrolled bills, and the clerks of the two Houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch of the govern-

ment. The evils that may result from the recognition of the principle that an enrolled Act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them.

"The views we have expressed are supported by numerous adjudications in this country, to some of which it is well to refer. In State v. Young, 32 N. J. L. 29, 37, the question arose as to the relative value, as evidence of the passage of a bill, of the journals of the respective houses of the Legislature and the enrolled Act authenticated by the signatures of the speakers of the two houses and by the approval of the governor. The bill there in question, it was alleged, originated in the house and was amended in the senate, but as presented to and approved by the governor, did not contain all the amendments made in the senate. Referring to the provision in the constitution of New Jersey requiring each house of the Legislature to keep a journal of its proceedings—which provision is in almost the same words as the above clause quoted from the Federal Constitution—the court, speaking by Chief Justice Beasley, said that it was impossible for the mind not to incline to the opinion that the framers of the constitution, in exacting the keeping of the journals, did not design to create records that were to be the ultimate and conclusive evidence of the conformity of legislative action to the constitutional provisions relating to the enactment of laws. In the nature of things, it was observed, these journals must have been constructed out of loose and hasty memoranda made in the pressure of business and amid the distractions of a numerous assembly. The Chief Justice said: 'Can anyone deny that, if the laws of the State are to be tested by a comparison, with these journals, so imperfect, so unauthenticated, that the stability of all written law will be shaken to its very foundation? Certainly no person can venture to say that many of our statutes, perhaps some of the oldest and most important, those which affect large classes of persons or on which great

interests depend, will not be found defective, even in constitutional particulars, if judged by this criterion. * * * In addition to these considerations, in judging of consequences, we are to remember the danger under the prevalence of such a doctrine to be apprehended from the intentional corruption of evidences of this character. It is scarcely too much to say that the legal existence of almost every legislative Act would be at the mercy of all persons having access to these journals; for it is obvious that any law can be invalidated by the interpolation of a few lines or the obliteration of one name and the substitution of another in its stead. I cannot consent to expose the state Legislature to the hazards of such probable error or facile fraud. The doctrine contended for on the part of the evidence has no foundation, in my estimation, on any considerations of public policy.' The conclusion was, that upon grounds of public policy, as well as upon the ancient and well settled rules of law, a copy of a bill bearing the signatures of the presiding officers of the two houses of the Legislature and the approval of the governor, and found in the custody of the Secretary of State, was conclusive proof of the enactment and contents of a statute, and could not be contradicted by the legislative journals or in any other mode.''

The court, in its opinion, further quotes from other state Supreme Courts, their pronouncements of equally persuasive reasons for the rule.

In State v. Lynch, 169 Iowa 148, this court held that the final, conclusive, ultimate and only evidence of the passage of a bill by both houses of the legislature is, the enrolled bill signed by both the President of the Senate and the Speaker of the House.

The relevant provisions of our State Constitution are found in Article III. Section 17 thereof provides:

''No bill shall be passed unless by the assent of a majority of all the members elected to each branch of the General Assembly, and the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays entered on the journal.''

Section 9 provides:

"Each house shall * * * keep a journal of its proceedings, and publish the same."

Section 15 provides:

"* * * every bill having passed both houses, shall be signed by the speaker and president of their respective houses."

Section 16 provides:

"Every bill which shall have passed the General Assembly, shall, before it becomes a law, be presented to the Governor. If he approve, he shall sign it; but if not, he shall return it with his objections, to the house in which it originated, which shall enter the same upon their journal, and proceed to reconsider it; if, after such reconsideration, it again pass both houses, by yeas and nays, by a majority of two thirds of the members of each house, it shall become a law, notwithstanding the Governor's objections. If any bill shall not be returned within three days after it shall have been presented to him, Sunday excepted, the same shall be a law in like manner as if he had signed it, unless the General Assembly, by adjournment, prevent such return. Any bill submitted to the Governor for his approval during the last three days of a session of the General Assembly, shall be deposited by him in the office of the Secretary of State, within thirty days after the adjournment, with his approval, if approved by him, and with his objections, if he disapproves thereof."

After quoting the aforesaid provisions of the Constitution, this court, in State v. Lynch, supra, said in substance, that some courts entertain the view that it is within their jurisdiction to ascertain whether the legislature, in fact, did what its presiding officers, by their authentication and signatures, say it did, and what the governor approved "and for that purpose to resort to the journals of the respective houses and even consider other evidence bearing on the question." We then declared:

"Other authorities are to the effect that while the constitution has prescribed the formalities to be observed in the passage of bills and the creation of statutes, the power to determine whether these formalities have been complied with is necessarily vested in the legislature, and a bill having been authenticated

and promulgated by the legislative department to the public in the manner authorized by the constitution, this is conclusive evidence of its proper passage by the legislature. As all decisions entertaining the latter view exact, as essential to the authentication of the enrolled bill and proof of its passage, the signatures of both the speaker of the house and president of the senate, inquiry as to whether we may look beyond the enrolled bill to ascertain whether it is in fact a statute of the state is pertinent. The expressions contained in the opinions of this court are in harmony with the authorities declaring the enrolled bill conclusive.''

A careful analysis of our prior pronouncements in State of Iowa v. Clare, 5 Iowa 508a; Duncombe v. Prindle, 12 Iowa 1; Koehler & Lange v. Hill, 60 Iowa 543; Darling v. Boesch, 67 Iowa 702; Miller v. City of Oelwein, 155 Iowa 706; and Conly v. Dilley, 153 Iowa 677, is then given. We then made the following pronouncement:

''It will be noted that the point under consideration was not involved in any of these cases, but it was covered by what was said in Duncombe v. Prindle, supra, and that decision is generally cited in opinions holding that the enrolled bill in the office of the secretary of state when properly attested is conclusive evidence of its enactment; and even though what was said in other decisions be dicta, these indicate the trend of thought of those concurring therein. Moreover, upon an examination of the conflicting authorities we are inclined to the opinion that this construction has the better reason for its support. There is quite enough uncertainty as to what the law is without saying that no one may be certain that an act of the legislature has become such until the issue has been determined by some court whose decision might not be regarded as conclusive in an action between other parties. Regardless of the good faith of a person or officer relying on the enrolled bill in the office of the secretary of state, this would afford no protection from the consequence of his acts if it should turn out that the journals or other evidence disclosed fatal defects in its passage. One believing that he was complying with the law might be unwittingly committing a crime, or an officer paying out money in supposed obedience to a statute might discover

too late that the enactment he undertook to obey had not been adopted in the manner prescribed by the Constitution, according to record of clerks, though the legislators were proceeding under solemn oath of obedience to the fundamental law. It seems quite enough that the average citizen must take notice of the contents of the enrolled bill, when duly authenticated, * * * after passage, without also putting upon him the burden of ascertaining the condition of the journal of the respective houses bearing thereon and determining for himself the effect of any irregularity therein tending to invalidate the bill. *Courts could not rely upon the published session laws, but would be required to look beyond these to the journals of the house and senate and often to any printed bills or amendments which might be found after the adjournment of the general assembly.* [Writer's italics.] Otherwise, after relying on the prima-facie evidence of the enrolled bills, authenticated as exacted by the Constitution, for years, it might be ascertained from the journals that an act theretofore enforced had never become a law. The inconvenience of such a rule and the consequent confusion is a strong argument against its adoption.

"What is the design of exacting the signing of the enrolled bills by the presiding officers of the two houses and the approval of the governor, and that they be deposited with the secretary of state? Is it not that these are the final records of the acts of the legislature for the information and guidance of other departments of government? If so, why should they not be accorded the respect usually accorded solemn records? If merely steps in the enactment of laws, why are not other matters exacted in the passage of a bill also required to be preserved? *The Constitution nowhere requires the bill to be made of record.* [Writer's italics.] Aside from entering the yeas and nays on the journal on final passage, no record except the enrolled bill duly authenticated is exacted by the fundamental law; and as the legislature is a co-ordinate branch of the government, in no sense inferior to the other branches and equally bound by oath of obedience to the Constitution, we perceive no reason for not regarding its final record as embodied in such enrolled bill, authenticated as required by Sec. 16 of Article 3 of the Constitution, as absolute a verity as the judgment of a court. Of

course, a judgment may be attacked, but not collaterally; and that is the only way an enrolled bill may be assailed.

"Each of the three departments of our government is equal and each should be responsible to the people whom it represents. The legislature enacts laws and is commanded by the Constitution to enact them in a certain way. The executive enforces the laws and by the Constitution it is made his duty to take certain steps looking toward such enforcement in the manner prescribed therein upon the happening of certain contingencies. The judicial department is charged with the duty of interpreting the laws, adjudging rights and obligations thereunder. Such being the respective duties of the several departments, it would seem that when certified to have been performed as required by the Constitution, this should be conclusive on the other departments; and there would seem no more impropriety in the legislature's seeking to go behind the final record of a court to determine whether it had obeyed some provision of the Constitution in making such record than there would be in the court's seeking to go behind the final record made by the legislative department. * * *

" 'Upon principle then, in view of the division into departments under our form of government, each of equal authority, one department cannot rightfully go behind the final record certified to it or to the public from either of the other departments. And the judicial department is no more justified in going behind the final act of the legislature to see if it has obeyed every mandatory provision of the Constitution than has the legislature to go back of the final record made by the courts to see whether or not they have complied with all the constitutional requirements.' State v. Jones, 6 Wash. 452; 23 L. R. A. 340."

The following authorities are cited as upholding said pronouncement: Evans v. Browne, (Ind.) 95 Am. D. 710; Pacific Railway Co. v. Governor of Missouri, 23 Mo. 353; Sherman v. Story, (Cal.) 89 A. Dec. 93; County of Yolo v. Coglan, (Cal.) 84 Am. St. Rep. 41; State ex rel. Panghorn v. Young, 32 N. J. L. 29; Marshall Field & Co. v. Clark, (U. S.) 36 L. Ed. 294, lengthy quotations from which are made in the opinion.

The majority rule announced in State v. Lynch, 169 Iowa 148, is supported by the United States Supreme Court and the courts of California, Indiana, Kentucky, Mississippi, Nevada,

New Jersey, New York, North Carolina, North Dakota, Pennsylvania, South Dakota, Texas, Utah, and Washington. See authorities cited in 36 Cyc. 972, Note 7.

The appellant relies on Dayton v. Pacific Mutual Life Insurance Company, 202 Iowa 753, where some statements in seeming conflict with the rule announced in State v. Lynch are made. In the Dayton case there was no discrepancy between what was shown by the enrolled bill authenticated by the Speaker of the House and President of the Senate and approved by the Governor, and what was shown relative to the passage of the bill by the journals. Everything disclosed by the record of the trial showed the enactment of the bill. Since there was no disagreement between the enrolled bill and the journals, there was no room for a presumption, conclusive or otherwise, that the enrolled bill, duly authenticated by the proper officers and signed by the Governor, should prevail. We there said:

"It is true that a court is not bound to accept the enrollment and publication of a bill as a finality." Citing Conly v. Dilley, 153 Iowa 677. For support of this statement, the court inadvertently relied upon the purest dictum in Conly v. Dilley, 153 Iowa 677, at 693. Immediately preceding the statement relied upon as supporting authority for the aforesaid quoted statement, we said, in the Dilley case:

"In the first place, it is extremely doubtful if the courts can properly go behind the enrolled bill to scrutinize the details of its legislative history for grounds upon which to hold it invalid."

It will be observed, that our pronouncement on this subject in the Lynch case, was several years after the decision in the Dilley case. Manifestly, there was no thought or intention on the part of this court in its decision in the Dayton case to overrule our definite and positive pronouncement in the Lynch case, for in the closing words of the opinion, the court declared:

"The enrolled bill is the exclusive and conclusive evidence, and ultimate proof of the legislative will. State ex rel. Hammond v. Lynch, 169 Iowa 148."

We adhere to our pronouncement in State v. Lynch, 169 Iowa 148, and anything in Dayton v. Pacific Mutual Life In-

surance Company, 202 Iowa 753, which is, or may be construed as, in conflict herewith, is hereby overruled.

It is apparent that the legislature, by Sections 28, 29 and 30 of Chapter 205, Acts of the 43 General Assembly, attempted to provide a new course of procedure for appeals from the action of the Board of Review, attempting to provide for an appeal from said board to the county board of review, and from the latter board to the district court. The appellant contends that the provisions of said sections are incomplete and so vague, defective, indefinite and uncertain, as to be unworkable, or incapable of enforcement, and therefore void and that, by reason thereof, its appeal from the action of the board of review to the district court is the correct method of appeal, under the only existing law. It is apparent, that appellant is right in its contention provided the amendments hereinbefore mentioned are void by reason of unworkability. The question presented is, Are said sections of Chapter 205, Acts of the 43 General Assembly, void? While it is the duty of the courts, if possible, to ascertain the meaning of, and give effect to legislative enactments, yet, if a statute is so vague, incomplete, defective, indefinite, or so conflicting or inconsistent as to be unworkable or incapable of enforcement, it then becomes the duty of the courts to declare it inoperative and void, and the remedy lies in future legislative enactment and not by adding to, or filling up the gaps in the defective legislation, by judicial legislation. See Midwest Hotel Co. v. State Board of Equalization, (Wyo.) 273 Pac. 696; State v. State Board of Canvassers, (Wis.) 150 N. W. 542; State v. West Side St. Ry. Co., (Mo.) 47 S. W. 959; People v. Sweitzer, (Ill.) 107 N. E. 902; State v. Partlow, (N. C.) 49 Am. Rep. 652; Standard Oil Company v. State, (Ala.) 59 So. 667; In re Hendricks, (Kans.) 57 Pac. 965; Sutton v. Rose, (Ky.) 5 S. W. (2d.) 892; People v. Emerson, (Ill.) 156 N. E. 474, 475; Hettinger v. Good Road Dist. No. 1 of Washington County, (Idaho) 113 Pac. 721; Litteral v. Blair, (Ky.) 129 S. W. 573; Knight v. Trigg, (Idaho) 100 Pac. 1060; Ex parte Lucas, (Ark.) 255 S. W. 870; R. R. Commission of Indiana v. Grand Trunk Western R. Co., (Ind.) 100 N. E. 852; In re Di Torio, 8 Fed. (2d.) 279. In Midwest Hotel Co. v. State Board of Equalization, (Wyo.) 273 Pac., 696, the court declared:

"To supply omitted material in a statute is often one of the most delicate and difficult tasks which can fall to the lot of a court of last resort. It is quite true that courts should endeavor by every rule of construction to ascertain the meaning of, and give effect to, each enactment of the legislature. It is equally axiomatic under our system of government that courts may not legislate. We think, therefore, that it is deducible both logically and from the current of authority that when a statute has been left by the lawmaking power unfinished and so indefinite and uncertain as to be incapable of enforcement, there remains nothing for the courts to do but to declare it void."

In State v. West Side St. Ry. Co. (Mo.), 47 S. W. 959, the court said:

"The courts cannot venture upon the dangerous path of judicial legislation to supply omissions or remedy defects in matters committed to a co-ordinate branch of the government. It is far better to wait for necessary corrections by those authorized to make them, or, in fact, for them to remain unmade, however desirable they may be, than for judicial tribunals to transcend the just limits of their constitutional powers."

In People v. Sweitzer, (Ill.) 107 N. E. 902, the court used the following apt language:

"An act is void where its language appears, on its face, to have a meaning, but it is impossible to give it any precise or intelligible application in the circumstances under which it was intended to operate."

In State v. State Board of Canvassers, (Wis.) 150 N. W. 542, the court made the following pronouncement:

"If the enactment is so uncertain that the court is unable to determine, with any reasonable degree of certainty, what the legislature intended, or it is so incomplete that it cannot be executed, there is no other course open but to condemn it as void for uncertainty, as this court has done on other occasions, and other courts have done so often that the duty in that regard has become a matter of unwritten law. * * * An intent, however, manifest, not discovered in the law and capable of being vitalized within the scope of it and fundamental restraints,

must fail. As said by Lord Campbell in Coe v. Lawrence, 1 El. & B. 516, and often approved by this and other courts: 'I really cannot doubt what the legislature intended to do; but they have not carried it into effect. * * * It is better that we should adhere to the words they have used, than that we should strive to amend it.' "

We will not extend the length of this opinion by further quotations from the authorities, but many of equally strong and persuasive character could be given.

Let us endeavor to analyze the enactment contained in the aforesaid sections. Under Section 7132-c1, an appeal may be taken from the action of the local board of review within ten days after the final adjournment of said board, by filing with the local board a notice of appeal and a duplicate thereof with the county board of review. An appeal cannot be taken until after the final adjournment of the local board, for until that time, said board retains jurisdiction. See Barz v. Board of Equalization, 133 Iowa 563. The board of review shall meet in cities having a population of ten thousand or over, on the first Monday in May, and in all other places, the board of review shall meet on the first Monday of April. After the final adjournment of the board of review (and there can be no appeal until after the final adjournment) there is no board of review as such until the following April or May. After the final adjournment of the board of review, the township trustees and members of the city or town council transact only the official business coming before them as township trustees or city or town officers, but the board of review, as such, is a non-existent body until the statutory time arrives for its members to reconvene as a board of review. The county board of review could obtain jurisdiction only by the appellant's strictly complying with the statutory law, if valid, for the taking of an appeal. Our most recent pronouncement on this proposition is Midwestern Realty Company v. City of Des Moines, 210 Iowa 942, the reading of which will show that we have closely adhered to the principle that the statutory law must be strictly followed in order to give the appellate tribunal jurisdiction to determine the matter involved in an appeal. Under the recent enactment, the appellant must file a notice with the local board of review. It will be observed that there is no provision of the statute that

it shall be filed with the township, town or city clerk, or with the one who presided at the meetings of the board, or with any one or all of the members who did constitute the local board of review prior to its adjournment, but it requires the filing of the same with the board which ceased to exist upon its final adjournment. One desiring to take an appeal is handicapped, for the statute requires him to file a notice with the local board of review, at a time when there is no such board. It is apparent, that the initial step required to take an appeal is impossible.

It will be noted, that the duplicate notice shall, within ten days after the final adjournment of the local board, be filed with the county board. There is no provision with whom, other than the county board, said duplicate shall be filed. In many cases (and that was true in the instant case), the county board of review will not be in session at the time when it is desired to take an appeal. There is no provision that it shall be filed with the county auditor or any one other than the county board of review.

Section 7132-c2 provides that the board of supervisors shall constitute a county board of review, and shall sit and act as such board at their regular meeting in May. There is no regular meeting of the board of supervisors in May. See Section 5118, Code, 1927. Moreover, in the instant case, the local board of review did not adjourn until the 31st day of May.

Section 7132-c3 provides that the county board may require the local board to certify the minutes of the proceedings, etc. There is no provision here for any duty resting upon any one in this respect, except upon a non-existent board.

Section 7132-c4 provides that the clerk of the county board shall transmit to the local board a statement of the findings and decision of the county board, and the statement of the changes made by the county board in the assessment complained of. Here again, we have a certification by the county board to a non-existent local board. Moreover, upon the adjournment of the board of review, the assessor makes up the assessor's books in duplicate and returns the same, together with the assessment rolls, to the county auditor. See Section 7123, Code, 1927. Section 7132-c4 does not attempt to make any disposition of the findings after their transmission to the non-existent local board. There is no legal machinery provided for the change upon the

assessment books in the auditor's office to conform to the findings of the county board. The statute absolutely drops the matter by requiring the county board to transmit a statement of its findings and decision to a non-existent local board.

Section 7137, Code, 1927, provides that the board of supervisors shall constitute a county board of review for the adjustment of the assessments of the several townships, cities, and towns of their respective counties. Section 7138, Code, 1927, provides:

"Appeals may be taken from any action or decision of a county board of review by the board of review of any city, town, or township aggrieved thereby, within the same time and in the same manner as appeals are taken from the local board of review."

These two sections of the Code remain unchanged. If the new legislation is valid, Section 7138 of the Code is rendered absurd in its operation, for under the new legislation, an appeal must be taken from the local board of review to the county board of review before going to the district court. Therefore, if, under Section 7138 of the Code, an appeal is taken from the decision by a county board of review in the same manner as an appeal is taken from a local board of review, there exists the anomalous situation of an appeal from the county board of review to the county board of review, or in other words, an appeal from one body to the same body. It is apparent, that Sections 28, 29 and 30 of Chapter 205, Acts of the 43 G. A., were all enacted as parts of this contemplated plan of an appeal from the action of the local board of review to a county board of review, and from a county board of review to the district court. They are inseparable and parts of the same contemplated plan. It is quite apparent, that the aforesaid sections are incomplete, defective, unworkable and wholly insufficient to provide the tax payer a remedy by appeal to an intermediate tribunal (a county board of review), which was apparently the legislative intent. We are forced to conclude that they are unworkable for the purpose intended, and therefore void. If the legislature still desires this course of procedure, it must be brought about by future legislative enactment and not by judicial construction of the statute as it now exists.

■ Our holding that the aforesaid sections of Chapter 205, Acts 43 G. A., are void for unworkability, shall not be construed as affecting the validity of the remainder of said chapter, which is not under attack. It is a rule of universal application that a statute may be valid in part, and invalid in another part, and if the invalid part is severable from the remainder, the portion which is valid may stand while that which is void may be stricken out and rejected, if after the elimination of the void portion, the remaining provisions are sufficient to be effective and accomplish their purpose in accordance with the legislative intent deducible from the act construed in the light of contemporary events. See note on page 10, Ann. Cas. 1916D, 6 R. C. L. 121; State v. State Board of Canvassers, (Wis.) 150 N. W. 542; Standard Oil Co. v. State, (Ala.) 59 So. 667.

Because Sections 28, 29 and 30 of Chapter 205, Acts 43 G. A., are void for unworkability, the action of the trial court in sustaining defendants' motion to dismiss the appeal for lack of jurisdiction is erroneous and the same is hereby reversed.— Reversed.

EVANS, DE GRAFF, ALBERT, MORLING, KINDIG, and GRIMM, JJ., concur.

FAVILLE, C. J., and STEVENS, J., dissent.

STEVENS, J. (dissenting).—In so far as the majority opinion holds certain portions of Chapter 205, Laws of the 43d General Assembly, void for uncertainty, I cannot concur. These provisions of the chapter which are quoted in full in the majority opinion must be construed in connection with the provisions of Chapter 343 of the Code of 1927, together with all of the provisions that precede Section 28, Chapter 205.

When so construed, all ambiguity and indefiniteness found by the majority to exist for all practical purposes readily disappear. Whatever informalities may exist in the statute they are such as are common where the authority and procedure of inferior tribunals are involved.

Section 28 of Chapter 205 is amendatory only of certain provisions of Chapter 343 with which it must be construed

and, if possible, harmonized. Section 7129 of the Code of 1927, so far as material to the present inquiry, is as follows:

"The township trustees shall constitute the local board of review for the township or the portion thereof not included within any city or town, and the city or town council shall constitute such board for such city or town. * * *"

Section 7133 of the Code of 1927, which authorizes a party aggrieved by the action of the local board of review to appeal to the district court, is as follows:

"Appeals may be taken from the action of the board with reference to such complaints to the district court of the county in which such board holds its sessions, within twenty days after its adjournment. Appeals shall be taken by a written notice to that effect to the chairman or presiding officer of the reviewing board, and served as an original notice."

Section 7137 of the Code of 1927, creating the board of supervisors as a county board of review, is as follows:

"The board of supervisors shall constitute a county board of review, and shall adjust the assessments of the several townships, cities, and towns of their county at their regular meeting in June, and add to or deduct from the assessed value of the property substantially as the state board adjusts assessments of the several counties of the state."

In the event that the finding and decision of the county board of review is unsatisfactory to local boards of review, such board may appeal to the district court in the same manner and within the same time as appeals may be taken by a party aggrieved from the decision of a local board of review. Section 7138, Code, 1927, is as follows:

"Appeals may be taken from any action or decision of a county board of review by the board of review of any city, town, or township aggrieved thereby, within the same time and in the same manner as appeals are taken from the local board of review."

Section 7132-c1, added by way of amendment to Section 7133, applies only to the method and time within which a party

758

aggrieved may appeal. Formerly, under the provisions of Section 7133, appeals were taken directly from the final order of the local board of review to the district court by the service of a written notice upon the chairman or presiding officer of such board. Section 7132-c1 has changed this method of appeal and provides that the same shall be taken "by filing with the local board a notice of appeal, and a duplicate thereof with the county board, within ten days after final adjournment of the local board, which notice shall specify the actual complaint of and the reasons assigned for such complaint." By specific provision of the foregoing statute, appeals from the local board of review can only be taken after the final adjournment of the board. Section 7133 of the Code of 1927 did not contain such provision but this court in Barz v. Board of Equalization, 133 Iowa 563, held that no appeal could be taken until after the final adjournment of the local board of review. The difference at this point is that the statute now covers the field formerly covered by the cited decision of this court. As already appears, the board of supervisors long prior to the enactment of Section 7132-c2, constituted a county board of review. The ambiguity, if any, in the new section is in the designation of the regular meeting of the board as in May instead of June. Section 7132-c3 authorizes the county board of review to require the local board to "certify the minutes of the proceedings resulting in such action and may affirm, reverse or modify the findings and decision of the local board."

Section 7132-c4 imposed the duty upon the county board of review to transmit to the local board from which an appeal has been taken a statement of the finding and decisions of the county board and what changes have been made thereby in the assessment complained of. The majority opinion emphasizes the contention that local boards of review cease to exist and pass out of existence each year upon final adjournment. This is obviously erroneous. The board of township trustees, town and city councils created by the legislature as local boards of review never pass out of existence. The legislative designation and investment of authority exist continuously. The *services* required to be rendered by such boards terminate each year when the same have been fully performed. The board is not resurrected each spring to perform the duties enjoined upon it but it

performs its duty as a continuing body without having suffered any of the pains and penalties of death. The prior statute which required notice of appeal to the district court to be *served* upon the chairman or presiding officer of the local board of review was subject to the same infirmity as the present statute which requires the notice to be *filed* with the local board of review. If the board goes out of existence upon final adjournment, then surely the chairman or presiding officer has likewise passed into "innocuous desuetude." Of course, no difficulty could be encountered under the prior statute in locating the former chairman or presiding officer of the local board of review. No such difficulty can possibly exist in the identification of the local board itself. There is no uncertainty as to what shall be done with the notice of appeal. It shall be *filed* with the local board of review. If deemed necessary, each member of the board could mark it filed but it seems to me too clear for discussion that it may be filed under the provisions of Section 7130 of the Code of 1927 with either the clerk of the township or the recorder of the city or town involved. The board has no more lost its potency by adjournment than the individual who served as chairman or presiding officer has lost his vitality by the same act. There is, it seems to me, no more lack of definiteness and certainty as to the identification of the county board of review with which a duplicate of the notice of appeal is to be filed than of the local board. The words "filing with the local board and with the county board," it seems to me, lack nothing in the way of certainty and precision. Ordinarily, as everybody knows, the county auditor is the clerk of the board of supervisors. All changes made by the county board of review upon appeal thereto are certified to the county auditor and made a part of the record of his office. Sections 7142-43, Code, 1927. The purpose of requiring the filing of a duplicate of the notice of appeal with the county board of review is to acquaint that body with the fact that an appeal has been taken and perhaps to confer jurisdiction thereon to act. It is inconceivable to the writer that any lawyer seeking to comply with the statute could have the slightest difficulty in causing the duplicate notice to be filed with the board of review. If done, this would constitute a literal compliance with the statute. Under the provisions of

760

Chapter 205, the county board of review is subject to the call of the state board of assessment and review.

Paragraph 9, Section 17, Chapter 205, Laws of the 43d General Assembly, is as follows:

"To require any county board of equalization at any time after its adjournment to reconvene and to make such orders as the state board of assessment and review shall determine are just and necessary; to direct and order the county board of equalization to raise or lower the valuation of the property, real or personal, in any township, town, city or taxing district, to order and direct any county board of equalization to raise or lower the valuation of any class or classes of property in any township, town, city or taxing district, and generally to make any order or direction to any county board of equalization as to the valuation of any property, or any class of property, in any township, town, city, county or taxing district, which in the judgment of the board may seem just and necessary, to the end that all property shall be valued and assessed in the manner and according to the real intent of the law."

Section 7132-c3 authorizes the county board to require the local board of review to certify the minutes of the proceedings which are questioned in the appeal. It is urged that the local board.is without power to do this because of its prior adjournment. The local board of review is the creature of statute and, in my opinion, is a continuous body and no difficulty whatever can be met by such local board of review when requested to make the certification. Naturally, the clerk of the township board of the recorder of the town or city would make the certification. No meeting or session of the board of review is contemplated or necessary. Section 7132-c4 simply requires that the action of the county board be transmitted to the local board. This is to be done by the clerk of the county board in whose office the permanent record is made and will be kept. This, as stated, is the county auditor. The only way the foregoing section could have been made more definite would have been the insertion of "county auditor" instead of "clerk."

But, it is further held by the majority that the use of the word "May" instead of "June" in Section 7132-c2 of Chapter 205 is fatal thereto. The difficulty, if any exists, at this point

is fully met and overcome by the provisions of Paragraph 9 of Section 17, Chapter 205, Laws of the 43d General Assembly, quoted above. The only possible confusion and uncertainty that could result from the error of the legislature in designating the term of the county board of review as the May, instead of the June, term would be in the preparation by the aggrieved person for trial. Such uncertainty would be of so little consequence as to scarcely require consideration. If any implication or implications are necessary to be drawn from the language of the statutes in question to give it validity, they are readily supplied and make practical the act as a whole.

Further, on the question as to the continuing existence of local boards of review: It is provided by Section 7138, Code, 1927, that cities, towns or townships, if aggrieved by the action of the county board of review, may appeal to the district court. Surely, such boards continue to exist for all the purposes of such necessary litigation. Appeals to the district court have always been entitled "Against the board of equalization" which board has, in the usual way, performed its assumed duty by appearing and defending its action. If the board continues to exist after final adjournment for the purpose of taking an appeal or defending litigation against it, it is because the legislature has impliedly at least recognized the existence thereof for such purposes. This being true, is not the intent of the legislature to require the board to perform certain acts designated in the new statutes in question with equal force and clarity implied?

As much as I dislike to disagree with my brethren I cannot subscribe to the majority holding as, in my opinion, the statutes in question are without substantial or troublesome ambiguity or uncertainty. I would affirm.

I am authorized to say that Chief Justice Faville concurs in this dissent.